UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| RICARDO DAVIDSON, | |
| Petitioner, | Case No. 1:14-cv-00161 |
| v. | Chief Judge Crenshaw |
| | Magistrate Judge Newbern |
| CHERRY LINDAMOOD, Warden,[1] | |
| Respondent. | |

To:     The Honorable Waverly D. Crenshaw, Jr., Chief Judge

## REPORT AND RECOMMENDATION

Petitioner Ricardo Davidson was convicted by a jury of possession of over 300 grams of cocaine with intent to sell or deliver it in a drug-free school zone and other drug-related offenses. He is now serving a fifteen-year sentence imposed by the Maury County (Tennessee) Circuit Court on August 13, 2010. (Doc. No. 30-2, PageID# 282.) Davidson initially filed this habeas corpus action pro se under 28 U.S.C. § 2254. (Doc. No. 1.) This Court appointed counsel for Davidson and ordered the filing of an amended petition (Doc. Nos. 16, 25). Respondent has answered the amended petition (Doc. No. 31) and filed the state court record (Doc. No. 30).

This matter is now ripe for the Court's review, and the Court has jurisdiction. Respondent does not dispute that Davidson's petition is timely and that this is Davidson's first habeas petition related to this conviction. (Doc. No. 31, PageID# 1734.)

---

[1]     Davidson's pro se petition named Derrick Schofield, Commissioner of the Tennessee Department of Correction, as respondent. Davidson moved to substitute Warden Lindamood as the proper respondent in this matter in his amended petition. (Doc. No. 25, PageID# 113, n.1.) Respondent has not opposed this substitution.

Davidson requests discovery and an evidentiary hearing on the issues raised in his petition. (Doc. No. 25, PageID# 122.) This Court need not hold an evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007). In determining whether an evidentiary hearing is necessary, the Court must consider the "deferential standards prescribed by [the Antiterrorism and Effective Death Penalty Act (AEDPA)," under which a state court's factual findings are presumed correct subject to rebuttal by clear and convincing evidence. *Id.*; 28 U.S.C. § 2254(e)(1). Having reviewed Davidson's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. Davidson is not entitled to relief under AEDPA's standards. The Magistrate Judge RECOMMENDS that his petition be denied and this case dismissed.

## I. Procedural History

On June 17, 2010, Davidson was convicted by a jury in the Maury County Circuit Court (hereinafter, the trial court) of four drug offenses: possession of more than 300 grams of cocaine with intent to sell in a drug-free school zone; conspiracy to possess over 300 grams of cocaine in a drug-free school zone; possession of over ten pounds of marijuana with intent to sell or deliver in a drug-free school zone; and conspiracy to possess over ten pounds of marijuana with intent to sell or deliver in a drug-free school zone. (Doc. No. 30-2, PageID# 278, 282–291; Doc. No. 30-9). Davidson's charges arose out of the delivery to his residence of a suspicious package ultimately found to contain narcotics. Davidson received the minimum sentence of fifteen years on each convicted offense, to run concurrently. (Doc. No. 30-2, PageID# 282–291; Doc. No. 30-9.) Davidson was represented at trial by attorney John Colley.

As a central part of Davidson's defense, trial counsel moved to suppress evidence seized during a search of Davidson's home. (Doc. No. 30-1, PageID# 144, 155–57.) Trial counsel argued

that the affidavit supporting the search warrant did not state that the suspicious package was addressed to Davidson or intended for delivery to Davidson's residence. (*Id.* at PageID# 144.) Trial counsel also argued that the affidavit supporting the warrant to search the package itself did not contain adequate proof of the alerting K-9's reliability and credibility to justify a search based on the dog's positive alert. (*Id.* at PageID# 156.) The trial court denied the motion to suppress after a hearing. (*Id.* at PageID# 169–170.)

Davidson appealed his conviction to the Tennessee Court of Criminal Appeals (TCCA), represented by Ronald Freemon. Appellate counsel only challenged the trial court's denial of the motion to suppress in Davidson's direct appeal. (Doc. No. 30-14, PageID# 1176.) The TCCA affirmed the trial court's judgment on May 17, 2012. *State v. Davidson*, No. M2010-02002-CCA-R3-CD, 2012 WL 1795147 (Tenn. Ct. Crim. App. May 17, 2012) (*Davidson I*); (Doc. No. 30-16.) The Tennessee Supreme Court denied permission to appeal on August 16, 2012. (Doc. No. 30-19.)

On October 18, 2012, Davidson filed a pro se petition for post-conviction relief in the trial court. (Doc. No. 30-20, PageID# 1285–1299.) The trial court construed Davidson's petition as raising a "general allegation of ineffective assistance of counsel" and asserting the following claims:

> (1) the convictions were based on use of evidence gained pursuant to an unconstitutional search and seizure, (2) the convictions were based on use of evidence obtained pursuant to an unlawful arrest, and (3) the convictions were based on illegal evidence. Additionally Petitioner alleges that his due process rights were violated due to the following: (4) an all white jury presiding in an African American Defendant's trial; (5) selection of a jury in an intentionally discriminatory manner; (6) the Court charging the jury relative to criminal responsibility; (7) the Court submitting the conspiracy counts to the jury; (8) the Court misconstruing its authority as thirteenth juror; (9) the Court failing to charge natural and probable consequence; (10) the Court failing to charge entrapment; and (11) disproportionate sentencing.

(*Id.* at PageID# 1340.) The trial court further understood Davidson to claim the ineffective assistance of his trial counsel for failing to raise or effectively advocate these eleven issues, in addition to failing to call Jason Coleman as a material witness at trial. (*Id.* at PageID# 1340–43.) The court also understood Davidson to claim the ineffective assistance of his appellate counsel for failing to preserve all of Davidson's constitutional claims and raising only one claim on appeal regarding the denial of the motion to suppress. (*Id.* at PageID# 96–97.)

The court appointed Seth Lasater as post-conviction counsel, and Lasater filed an amended post-conviction petition on December 28, 2012. (*Id.* at PageID# 1334–35.) The amended petition incorporated all of the allegations of Davidson's pro se petition and clarified that Davidson's claim regarding the jury panel and selection raised due process and equal protection violations. (*Id.*) The trial court held an evidentiary hearing on May 24, 2013, at which Davidson, trial counsel, and appellate counsel testified. (Doc. No. 30-21.) On June 20, 2013, the trial court denied the petition for post-conviction relief on all grounds. (Doc. No. 30-20, PageID# 1339–1344.)

On December 4, 2013, post-conviction counsel appealed the denial of Davidson's petition to the TCCA.[2] (Doc. No. 30-23.) The appeal asserted that the post-conviction court erred in denying relief on the following four ineffective assistance of counsel claims: "Trial counsel failed to adequately argue suppression of search warrant[;] [t]rial counsel failed to argue issue of racial makeup on Motion for Acquittal or New Trial[;] [t]rial counsel failed to make argument and request jury instruction under the Natural and Probable Consequences Rule[;] [and] [b]oth trial counsel and appellate counsel failed to keep adequate communication with [Davidson]." (Doc. No. 30-23, PageID# 1595.) On July 31, 2014, the TCCA affirmed the denial of post-conviction relief

---

[2]     Prior to the filing of this appeal by Lasater, Davidson filed a pro se habeas corpus petition in Maury County Circuit Court. (Doc. No. 14, PageID# 96.) That petition was dismissed and the dismissal was affirmed by the TCCA. (*Id.* at PageID# 95–98.)

on each of the four asserted grounds. *Davidson v. State*, No. M2013-01645-CCA-R3-PC, 2014
WL 3765710 (Tenn. Ct. Crim. App. July 31, 2014) (*Davidson II*); (Doc. No. 30-25.) The
Tennessee Supreme Court denied permission to appeal on November 20, 2014. (Doc. No. 30-27.)

Davidson timely filed this federal action pro se on December 15, 2014. (Doc. No. 1.) The
case was administratively closed to allow Davidson to fully exhaust his state court remedies and
was reopened on April 10, 2015. (Doc. Nos. 9, 16.) The Court appointed counsel, who filed an
amended petition. (Doc. No. 25.)

## II.  Statement of Facts

The following summaries of facts are taken from the TCCA's consideration of Davidson's
suppression hearings and trial on direct appeal, *Davidson I*, 2012 WL 1795147 at *1–7, and post-
conviction evidentiary hearing, *Davidson II*, 2014 WL 3765710 at *10–15.

### A.  Motion to Suppress

This case arises from law enforcement officers' interception of a mailed package
that was believed to contain drugs. After obtaining a search warrant to open the
package, the officers discovered it contained drugs. They then delivered the
package to the intended address, where they also executed a second search warrant
and found more drugs. A Maury County grand jury indicted the Defendant for four
felony drug offenses and possession of drug paraphernalia. The Defendant filed a
motion to suppress the evidence obtained as a result of the search warrants.

At the first hearing on the motion to suppress, neither party presented evidence
other than the search warrants themselves. The parties offered the trial court
arguments based upon the warrants. The defense argued that there was no nexus
between the affidavit and the address searched. Defense counsel noted that this case
involved a suspicious UPS package that was opened, and, based upon its contents,
law enforcement officers obtained a search warrant. Defense counsel assumed that
the address for which they obtained the search warrant was the address to which
the UPS package was addressed, but defense counsel argued that nothing in the
affidavit alleged that fact.

The State conceded that the affidavit supporting the search warrant never
specifically stated that the address that law enforcement officers sought to search
was the same address as that listed on the UPS package. The State asserted,
however, that when the search warrant was read as a whole, it was obvious from

the search warrant that such was the case. The State further noted that the affidavit stated that the officer swearing to the affidavit believed, based upon his knowledge and experience, that the two people listed in the affidavit, who were the occupants of 638 Mooresville Pike, Columbia, Tennessee, were anticipated to take possession of the package.

Defense counsel countered that the package was addressed to a man named "Jerry Fryson" and not to the Defendant. Defense counsel then asked to file an amended motion based upon the law enforcement officer's alleged "intentional" act of omitting the address of the recipient of the package when seeking a search warrant for the Defendant's residence. The trial court granted the Defendant's request to file an amended motion and set a hearing for a later date.

At the hearing on the amended motion to suppress, the parties presented the following evidence: Michael Perez, a Nashville Drug Task Force officer, testified that this investigation began on July 2, 2007. On that day, he received a phone call from "Andy," an officer with the Los Angeles Police Department who worked in the parcel narcotics unit. Andy advised Officer Perez that there was a package that he suspected contained narcotics or narcotics proceeds coming to Columbia, Tennessee, from the Los Angeles area. Based upon this information, Officer Perez contacted Special Agent Mabry with the Tennessee Bureau of Investigation and asked if he had a law enforcement contact in the Columbia area. Agent Mabry confirmed he did have a contact and called the Maury County Sheriff's Department for assistance in a potential controlled delivery of the package.

Officer Perez testified that he and Agent Mabry, along with other officers, went to the UPS facility before the package was placed on the outgoing delivery truck. The officers used a K-9 drug dog, trained as a drug detector, to identify whether the package may, in fact, be emanating odors of narcotics. The drug dog indicated positively on the package, which was addressed to Jerry Fryson. The address was listed as 638 Mooresville Pike in Columbia, Tennessee. Officer Perez said, based upon this information, the officers obtained a search warrant to open the package. Inside the package, they found foam under which was located marijuana. Officer Perez said that, upon finding the marijuana, the officers did not disturb the package further, hoping to successfully conduct a controlled delivery of the package.

Officer Perez testified that he went with Maury County Sheriff's Department officers as they executed "an anticipatory search warrant" at the address listed on the package. He said he did not personally identify who lived at that address, and he was not involved further in the investigation until after the execution of the second search warrant.

On cross-examination, Officer Perez testified that he attempted to determine whether Jerry Fryson was a real person. He explained that he searched the Tennessee driver's license files for a "Jerry Fryson." Officer Perez read from the affidavit requesting the search warrant, wherein another officer, Officer Brian

6

Cook, swore that the search revealed that there was no person with the name Jerry Fryson licensed in the State of Tennessee. The affidavit further stated that individuals dealing in controlled substances very often create false names for parcels to conceal their true identities.

Officer Brian Cook, with the Maury County Sheriff's Department, testified that he was assigned to the Drug Task Force in 2007. He said that he was present on July 3, 2007, when the suspicious box was opened at the UPS facility. Upon opening the package, officers discovered that it contained illegal narcotics, and they resealed the package for a controlled delivery. Officer Cook said he typed an "anticipatory search warrant" to serve on the residence after delivery of the package. Officer Cook said he listed "Jerry Fryson" as one of the people to be searched, but he did not specifically indicate in the warrant that the package was addressed to "Jerry Fryson."

Officer Cook testified that the affidavit indicated that, based upon Officer Cook's belief and training, "Miss Malave and Mr. Davidson are the current residen[ts] at 638 Mooresville Pike, and they are who the said package is intended to be delivered." The officer agreed that the affidavit does not state in "plain language" that the package was addressed to 638 Mooresville Pike.

On cross-examination, Officer Cook testified he did not intentionally omit from the affidavit that the package was addressed to Fryson but stated that he listed him as a person to be searched. He further stated that, after learning the package was addressed to 638 Mooresville Pike, he and another officer, Lieutenant Bill Doelle, drove by that address and ran the vehicle tags of the two cars parked at the residence. One of the two cars was registered to Dana Malave. When the officer ran Malave's name through law enforcement computer programs, the programs listed the Defendant as her acquaintance who also lived at the same address. Officer Cook testified that the package was successfully delivered to 638 Mooresville Pike and that it contained around three pounds of marijuana and a kilogram of cocaine.

On redirect examination, Officer Cook testified that he checked to see if either Malave or the Defendant were suspected drug traffickers, and they were not. He agreed that the only link between Malave, the Defendant, and the package was that they were residents of the address listed on the package.

Upon questioning by the trial court, Officer Cook testified that the marijuana contained in the box had a value of $3,000 and the cocaine had a value of $26,000.

The trial court denied the Defendant's motion to suppress. In so doing, it found:

> The Fourth Amendment of the U.S. Constitution, and the corresponding provisions of the State Constitution, do not absolutely prohibit searches. They just prohibit unreasonable searches and seizures.

In this case, State and local officers, based on reliable information from fellow officers in California, began an investigation. That investigation was of a package addressed to 638 Mooresville Pike, they first p[erus]ed the interior of the package to confirm whether it did contain controlled substances, and they confirmed at least one controlled substance in the package before we sought the second warrant, and performed then the delivery and the eventual execution of that second warrant.

I think the second warrant, as I said in February, on its face, states or implies—and I'll have to say, mostly implies—that the package is addressed to 638 Mooresville Pike, and to one or more of those persons that resided there.

They had gone far enough to investigate the vehicles and who those vehicles were registered to at that address, and naming people that they believed to be living there, based on their investigation, and that they had reason to believe, based on their experience, which I think people with sufficient experience may state opinions, in court, and certainly in search warrants.

And that they had some reason to believe that Mr. Fryson may not exist, but at the same time, there may be someone there at the residence with that same spelling or a phonetic similarity to that spelling. And the magistrate had probable cause, based on what was contained within the four corners of the second . . . affidavit, a part of Exhibit 1, to issue that second warrant, which was a part of Exhibit 1.

If the magistrate has the authority to also consider what he did an hour and 35 minutes earlier, at 8:55, before the 10:30 second warrant, there is even stronger proof that Jerry Fryson . . . did not appear to exist, as a person licensed to drive a vehicle in Tennessee, and that it was appropriate to look at who might reside at that residence for probable cause purposes.

[Defense Counsel], the reason I asked about the value of the substance, there is pretty strong proof that someone is not going to mail $39,000.00 worth of controlled substances to an address on Mooresville Pike if they have absolutely no idea about who is going to get it. And the people that live at that address are the most likely people to receive it.

So somebody that put that address on a box must have expected the occupants of that residence to be the ultimate recipient of the

intended delivery. And I've not heard any evidence in this record that anyone named Jerry Fryson or Jerry Frierson, which we have a number of Friersons in Maury County, lived at that address or that there was any mistaking the 638 address, or that this package was intended for anyone other than persons in possession of [the residence at] 638 Mooresville Pike.

. . . .

I believe you can make reasonable inference from the facts stated, and the facts stated here are that they anticipate delivering this box to 638 and that these two defendants are the occupants of that residence. And that, therefore, it's reasonable, under the Constitution, to conduct a search of those premises and the people in charge or in possession of those premises.

**B.      Trial**

After the trial court denied the Defendant's motion to suppress, it held a trial. The Defendant does not appeal the sufficiency of the evidence supporting his convictions, limiting his appeal to whether the trial court erred when it denied his motion to suppress, so we will briefly summarize the facts presented at trial in the light most favorable to the State.

On July 2, 2007, DEA Task Force Officer Michael Perez received information from Los Angeles Police Department Detective Andrew Smith that a suspicious package was coming to Columbia, Tennessee, via UPS. The package was addressed to Jerry Fryson and was to be delivered to 638 Mooresville Pike in Columbia, Tennessee. Agent Mabry attempted unsuccessfully to locate an individual by the name "Jerry Fryson" in public databases. Agent Mabry was not surprised by his failure to locate a "Jerry Fryson" because, he said, packages of this nature often bear a fictitious name.

Officers went to the UPS facility with a K–9 drug dog officer. The K–9 officer smelled several packages and alerted officers to a package addressed to "Jerry Fryson." Based upon the information from the Los Angeles Police Department officer and the K–9 officer's alert, officers obtained a search warrant to open the package, and, when they did, they found a white foam packaging material beneath which was a leafy green substance that they deemed was narcotics. Once the officers confirmed there were narcotics inside the box, they put the box back together so it could be delivered to the address in order to identify the intended recipients of the illegal drugs in a controlled manner.

Officers applied for and were granted an "anticipatory search warrant." The warrant required that certain events happen before the warrant could be executed. In this case, the package had to be delivered to the house before the warrant could be

executed. The search warrant included the names Jerry Fryson, Dana Malave, and the Defendant as the potential people to be searched.

While other officers conducted surveillance, Officer James Whitsett, who was assigned to the DEA in Nashville, delivered the box. Officer Whitsett, dressed as a delivery man, took the box to the residence. There, the Defendant approached him and said that the package belonged to him. Officer Whitsett handed the Defendant the package, and the Defendant set it down and then picked it back up and took it to an "outbuilding" or "little barn" that was adjacent to the residence. Once the box was delivered, officers executed a search warrant on the residence and the outbuilding where the Defendant had taken the box. Officers found the box and noted that it had not yet been opened. In the shed, officers also found plastic baggies on a work bench, a large box that contained scales, and a duffle bag that contained large blocks of marijuana and a Bible. The Bible contained writing that said that it had been presented to "Jason Coleman." Officers also found a pistol inside the house on top of one of the kitchen cabinets. Also in the kitchen, officers found a letter bearing the name "Jay Coleman" and listing his address as Wasco State Prison. The letters, written in April and August 2006, were read into evidence and seemingly discussed some illicit activity. Other mail found inside the residence linked Malave and the Defendant to the residence.

In the master bedroom of the residence, officers found a plastic tote that contained marijuana, plastic wrap, a set of scales, paper plates with some loose marijuana, a utility knife, and a bag that contained plastic baggies.

Officers interviewed the Defendant, who initially said that he did not know what was in the package and that it belonged to Malave. Later, the Defendant said that he had been receiving packages for a man named "Jay Coleman." Officer Whitsett was familiar with Coleman and had previously investigated him previously for carrying large sums of currency. Coleman had been arrested on several occasions for drug related activity in both Tennessee and California. The Defendant told officers that he received $500 for accepting each package, and, while he was unsure what the packages contained, he believed they contained narcotics. Officers attempted without success to contact "Jay Coleman." The Defendant also told police officers that the marijuana discovered in his bedroom did not belong to him. He said that he was waiting for someone to come and pick it up.

TBI Agent Jennifer Sullivan analyzed the substances contained in the package. She determined that the box contained 28.8 pounds of marijuana and 996.4 grams of cocaine, 6 tenths of a gram less than a kilogram of cocaine. Agent Sullivan also tested the digital scales found in the residence and found cocaine on the scales. Lieutenant William Doelle testified that the street value of the marijuana was almost $60,000, and the street value of the cocaine was $99,640 if it remained in the powder form and up to $400,000 if the cocaine was altered into crack cocaine.

Officers measured the distance from the Defendant's house to a nearby child care facility. They determined that the residence was less than 1000 feet from a licensed day care facility.

The Defendant offered evidence that he raced motorcycles locally and also fixed them in his shop. The defense presented multiple police officers who testified that they had paid the Defendant to work on their motorcycles either at the Defendant's motorcycle shop or at the Defendant's house. In order to obtain parts to fix the motorcycles, the Defendant ordered and received many packages containing motorcycle parts, which were usually delivered by UPS or FedEx.

Regarding the events that surrounded the Defendant's arrest, Sheila Duke testified that she and her children went to a cookout at the Defendant's house on July 2, 2007, at around 6:00 p.m. Her boyfriend, Mark Booker, met them there later that night. Duke recalled that the Defendant, the Defendant's girlfriend, Dana Malave, and a man named "Jay" were present. Mark Booker testified that "Jason Coleman" was at the Defendant's house on July 2, 2007, while they were "cooking out." He said he knew Coleman through the Defendant and knew that Coleman raced four-wheelers.

Dana Malave testified that she and the Defendant had three children and that, in July 2007, the Defendant worked on motorbikes out of a shed at their home. Malave said she knew Jason Coleman. Coleman had purchased a motor bike from the Defendant, and on July 2, 2007, Coleman was at their house intermittently, leaving and returning several times. Coleman ate dinner with them and left for the last time at around 9:30 p.m. Malave said that, when she went into her bedroom after Coleman left, and there was a plastic tote in the bedroom. The Defendant told her that Coleman had left the tote and would return later that evening to retrieve it. Coleman, however, never returned to retrieve the tote. Malave claimed that neither she nor the Defendant knew the contents of the tote.

The Defendant testified and explained that he often ordered and received packages of motorcycle parts for his motorcycle repair work. He said that he used plastic wrap to wrap motors, and he used plastic bags to organize motorcycle parts. He explained that he used scales to weigh nitrous oxide, which he used to make motorcycle engines faster. The Defendant said that he knew Jason Coleman and that the two met approximately three years before the Defendant's arrest when Coleman brought him a bike to repair. He said he fed Coleman's dogs while Coleman was incarcerated. The Defendant confirmed that Coleman brought a blue tote to his house on July 2, 2007, saying he would return shortly to retrieve it. The Defendant said Malave told him the tote smelled and asked him to remove it. The Defendant said he was expecting a package of motorcycle parts on July 3, 2007. They were to be delivered by UPS, and, when the UPS man arrived, he assumed the box contained the parts he was anticipating. The Defendant denied knowing the package contained drugs and denied having an agreement with Coleman to receive the package in exchange for $500.

Based upon this evidence, a jury convicted the Defendant of possession of more than 300 grams of cocaine with intent to sell within a Drug Free School Zone, possession of over ten pounds of marijuana with intent to sell within a Drug Free School Zone, conspiracy to possess over 300 grams of cocaine within a Drug Free School Zone, and conspiracy to possess and deliver over ten pounds of marijuana in a Drug Free School Zone.

*State v. Davidson*, 2012 WL 1795147, at *1–7; (Doc. No. 30-16, PageID# 1223–27.)

## C.      Post-Conviction Evidentiary Hearing

The petitioner filed a timely pro se petition for post-conviction relief and a supporting memorandum of law. In the petition, the petitioner attempted to challenge various constitutional infirmities, as well as challenging trial counsel's performance. Following the appointment of counsel, an amended petition was filed. A hearing was held at which the petitioner, trial counsel, and appellate counsel each testified.

The petitioner testified that he hired trial counsel to represent him in the case in 2007, approximately three months after the offense happened. Trial counsel began his representation in general sessions court.

The petitioner acknowledged that trial counsel had filed a motion to suppress. However, he complained that trial counsel had failed to raise the correct arguments and adequately argue at the hearing. He wanted trial counsel to argue that the anticipatory warrant was not executed properly because the package was not "delivered" to a person, rather it was left on a 4-wheeler rather than being placed into a person's hands. Because "delivery" was a prerequisite to the execution of the warrant, the petitioner contended that the warrant was not authorized. He faulted trial counsel for failing to discuss this with him or argue the issue to the court.

The petitioner also faulted trial counsel for failing to argue at the motion to suppress hearing that there was a discrepancy in tracking numbers listed in the affidavit. The petitioner is correct that the affidavit referenced package number . . . 26318, but the package number was in reality . . . 56318. This issue was never discussed by trial counsel, but the petitioner noticed the discrepancy and thought trial counsel should have recognized that it was an issue to argue. The petitioner did acknowledge that the discrepancy was only one number, and, on cross-examination, he admitted the number was correct on the warrant and was probably just a "typographical error."

The petitioner also acknowledged that the address for delivery was his home address, although the package was addressed to someone else. He further acknowledged that he picked the package up off the 4-wheeler and moved it into the shed. He stated that he ran a motorcycle shop and thought that the package

contained parts he had ordered. He testified that he never opened the package. The petitioner did acknowledge that law enforcement officers took no action until he had placed the package inside of the shed. He further acknowledged that officers found twenty-two pounds of marijuana in a different location on the property and found three to four pounds in a tote bag in the petitioner's bedroom. Additionally, officers found scales with cocaine residue on them inside the workshop where the petitioner took the package.

The petitioner's second complaint against trial counsel was that he failed to secure the presence of Jason Coleman, a friend of the petitioner's, to testify at trial. The petitioner testified that he informed trial counsel that Mr. Coleman needed to testify, and he felt that trial counsel should have done whatever was necessary to ensure that that occurred. He did acknowledge that trial counsel had filed a petition with the court to deem Mr. Coleman a material witness in the case. The petitioner further acknowledged that trial counsel, upon learning that Mr. Coleman was in California, hired an out-of-state attorney to try to secure his presence at trial. However, the petitioner felt that trial counsel did not do his best to find Mr. Coleman for trial. While acknowledging that he was a friend of Mr. Coleman, the petitioner testified that he refused to aid trial counsel in serving a subpoena on Mr. Coleman's father to try to get information regarding Mr. Coleman's whereabouts. The petitioner testified that he was not aware what Mr. Coleman would have actually testified to had he been secured as a witness. He did point out that evidence was presented at trial that a bible with Mr. Coleman's name in it was found in the duffel bag containing the twenty-two pounds of marijuana.

The petitioner, an African American, next faulted trial counsel for failing to adequately raise and argue an issue regarding the lack of African Americans on the jury. The petitioner acknowledged that trial counsel did raise the issue pre-trial and that it was raised in the motion for new trial. However, it was not raised on appeal. The petitioner stated that there was a hearing conducted on the matter pre-trial at which trial counsel argued. He further complained that, although trial counsel listed the issue in the motion for new trial, he did not make any oral argument with regard to the motion. Instead, trial counsel submitted the motion on the merits and the arguments contained within it. The petitioner testified that he did not authorize this decision.

The petitioner testified that trial counsel was playing chess on his computer during the trial. According to the petitioner, he did not address this issue with trial counsel because he trusted him. However, trial counsel did not really seem to be paying attention to the trial. The petitioner also testified that trial counsel failed to investigate and prepare a defense for the trial. He specifically testified that he believed the defense of entrapment was viable and should have been investigated. He testified that trial counsel failed to subpoena witnesses and should have investigated fingerprint evidence. The petitioner testified that trial counsel failed to argue pertinent issues. He claimed that a jury instruction should not have been given on criminal responsibility because it was not charged in the indictment, and he was

not aware that he had to defend himself against the conduct of another. The petitioner also faulted trial counsel for failing to have the jury charged with the natural and probable consequences rule, which was an essential element of criminal responsibility. He acknowledged the rule was mentioned during the jury charge, but he claimed it was not adequately defined.

On cross-examination, the petitioner acknowledged that he chose to testify at trial, that it was his decision, and that he wanted to tell the jury himself that he was innocent. He further acknowledged that the evidence was indeed all found on his property after he picked up the package and transported into his shed, although he claimed he believed the package contained motorcycle parts. He told the jury that he used the scales found to weigh nitrogen tanks used in his repair of motorcycles. He acknowledged that trial counsel did introduce photographs of those tanks to the jury.

At the post-conviction hearing, the petitioner did acknowledge that trial counsel had almost three years to prepare for the case, and the petitioner was on bond during this period. However, he testified that for certain long periods he had no contact with trial counsel. The petitioner testified that the case was set for trial three or four times prior to the actual trial, but he claimed trial counsel did not inform him of the reasons for the continuances he was granted. He noted that trial counsel did inform him of an offer extended by the State which was for one year in the county jail followed by fourteen years' probation. However, the petitioner refused the offer because he maintained his innocence, and an acknowledgment of guilt was a prerequisite to the offer.

With regard to his appellate counsel, the petitioner faulted him for raising only one issue on appeal. He acknowledged that sufficiency of the evidence was included in the motion for new trial, but it was not raised on appeal, which he claimed limited his appeal. The petitioner testified that appellate counsel failed to discuss the possibility of filing an amended motion for new trial raising other issues which had not been included. The petitioner testified that he basically never really talked to appellate counsel at all.

The next witness to testify was trial counsel. He testified that he had been practicing law since 1986 and that his case load involved ninety percent criminal work. He testified that he had handled multiple drug cases during his career and was familiar with anticipatory search warrants and the legalities of them.

Trial counsel testified that he felt that he did a good job in helping the petitioner and keeping him "in the loop" with regard to the case. He stated that he communicated with the petitioner primarily by letter or by telephone, but he noted that the petitioner dropped into his office on several occasions. He noted that, in the almost three-year preparation of the case for trial, he might have been out of touch with the petitioner for two to three months on a few occasions. Trial counsel testified that it was unusual for a case of this nature to linger in the court system for

almost three years. He explained that this was in large part due to the continuances trial counsel kept requesting in order to find witnesses and prepare the defense. With regard to the allegation that he played chess on his computer during the trial, trial counsel stated that he would have only done so during jury instructions or during a delay in the proceedings. He was adamant that he did not play games during any argument or testimony.

With regard to plea offers from the State, trial counsel recalled one early in the case for ten years at thirty percent. However, when he presented the offer to the petitioner, the petitioner vehemently refused to consider the offer. He maintained that he was innocent and that he would not spend one day in jail. The petitioner refused to even submit a counteroffer to the State.

Trial counsel testified that he filed a motion to suppress while the case was in general sessions court. He recalled that the general sessions court denied the motion and bound the case over to the grand jury. Trial counsel recalled that he felt very strongly about the warrant issue he raised in the motion to suppress. He focused upon the fact that there were lots of details contained in the first warrant which were not included in the second, and no reference was made to the first in the second. Trial counsel felt that he had a strong argument on the issue. He testified that he was not aware of a discrepancy in the tracking numbers on the warrant and the affidavit. At the post-conviction hearing, he testified that he did not feel that the discrepancy was a major error, appearing to be just a typographical error, and noted there was no showing of reckless or intentional misrepresentation by the State. He testified that, even had he known of the issue, he probably would not have raised the issue in the motion to suppress. He felt that the negligent error would not have garnered any relief.

Trial counsel also testified that he and the petitioner had discussed the anticipatory nature of the warrant, that the package was left in the yard, and that the petitioner personally picked it up and carried it into his workshop. In trial counsel's opinion, he believed that this satisfied the delivery requirement noted in the anticipatory warrant. Trial counsel testified that he felt, based upon the petitioner's actions, he had no grounds upon which to challenge the delivery requirement in a motion to suppress. He further noted that, as the petitioner's representative, he was charged with choosing which issues to litigate, noting that if he chose issues with no chance of success, his credibility could be damaged before the court.

Trial counsel testified that he was aware of Jason Coleman as a possible witness and that he and the petitioner had discussed him repeatedly. He testified that he expended a great deal of effort in the case to try to secure Mr. Coleman's presence at the trial. He sought multiple continuances in his attempt to locate the witness. Trial counsel testified that through their intense investigation, they became aware that Mr. Coleman was in California. Trial counsel hired a California attorney to assist him in the attempt to locate Mr. Coleman. Trial counsel filed motions in both Tennessee and California in his attempt to secure Mr. Coleman's presence at the

trial. He finally obtained an order from the court, but, when the order was to be executed, they discovered that Mr. Coleman's parole had expired, and he could not be found. Trial counsel also testified that he attempted to speak with Mr. Coleman's father in his search for the witness.

Trial counsel was never able to actually speak with Mr. Coleman, so he was unclear exactly what he would have testified to had he testified at trial or if it would have benefitted the petitioner's case. He did learn that the package sent to the petitioner had been sent from an address very near Mr. Coleman's listed parole address in California. Trial counsel also learned that Mr. Coleman flew from California shortly before the package was to be delivered and was picked up at the airport by the petitioner. Trial counsel stated that, if Mr. Coleman did not invoke his fifth amendment rights, this could be the information he would have testified to. Regardless, trial counsel was able to get some information regarding Mr. Coleman before the jury through defense witnesses and the fact that Mr. Coleman's Bible was located in the duffel bag found during the search.

Trial counsel testified that he was aware Mr. Coleman was listed as a co-conspirator on the indictment, although there was no actual indictment issued against him. Trial counsel testified that there was nothing illegal regarding unindicted co-conspirators and that it was a normal practice. Nothing in the action aided in the petitioner's defense. Trial counsel also testified that he was familiar with the entrapment defense. Based upon his experience, he did not believe that the defense was applicable to the petitioner's case. Trial counsel did not believe that they could show the lack of pre-disposition necessary to establish the defense based upon the drugs found in the petitioner's bedroom.

Trial counsel also testified that he raised the issue of the jury venire prior to trial. He testified that he filed a motion when he saw how under-represented African Americans were in the venire. He stated that he made Batson challenges and went even further by calling the Deputy Clerk to establish why there was under-representation in the jury pool. He argued that the manner in which members of the pool were being excused did not comply with the statute. However, the court again overruled his argument.

Trial counsel testified that, following the trial, he filed a motion for judgment of acquittal/motion for new trial raising multiple issues. The issues included sufficiency of the evidence, the denial of the motion to suppress, the under-representation of African Americans on the jury, and the Drug Free School Zone enhancement. Trial counsel testified that he was trying to hurry to get to the appeal so, if they were successful, the petitioner would spend less time in jail. He did not dispute that he did not argue the motion for new trial but rather submitted it solely on the arguments made at trial and contained within the motion. He testified that the issues had all been raised during the trial, and the record reflected that. He felt that no argument was necessary.

Trial counsel testified that he offered to do the petitioner's direct appeal for free, aside from the cost of transcripts, based upon his belief that the searches in the case were illegal. However, before the transcripts were prepared, trial counsel was informed by the petitioner that he no longer had faith in his representation. At that point, trial counsel instructed the petitioner that he needed to obtain new representation.

The final witness to testify was the petitioner's appellate counsel. He testified that he was appointed to represent the petitioner, met with him, and reviewed the issues. Appellate counsel testified that he did not file an amended motion for new trial, so his issues were limited to those raised in the motion for new trial by trial counsel. He conducted research on the issues, and he felt that he needed to focus on the issues with the best opportunity to get the convictions set aside. In his opinion, the strongest issue was the motion to suppress.

However, on appeal, with regard to the motion to suppress, he chose to focus on the discrepancy between the tracking numbers on the warrant and the affidavit. Appellate counsel testified that he believed this to be the strongest issue, although this court found the issue to be waived because it was not addressed in the motion for new trial. Appellate counsel also believed that the anticipatory warrant deficiencies were a strong issue.

Appellate counsel testified that he did not challenge the sufficiency of the evidence on appeal because he believed that, if the evidence was admissible, it was sufficient to establish the convictions. Appellate counsel also did not feel that the drug free school zone or the jury issues were strong enough to merit any relief on direct appeal.

Appellate counsel testified that he met with the petitioner one time for approximately an hour. He showed the petitioner the brief he had prepared, and the petitioner seemed pleased with his efforts. He did not feel that the petitioner disputed the plan to raise only the suppression issue on appeal.

After hearing the evidence presented, the post-conviction court, by written order, denied the petition for relief. The petitioner has timely appealed that decision.

*Davidson II*, 2014 WL 3765710, at *10–15.

## III.    Issues Presented for Review

Davidson's amended petition in this Court raises the following claims:

(1)    Ineffective assistance of trial counsel and appellate counsel based on

      (a)    failure to raise adequate arguments in the motion to suppress;

      (b)     failure to challenge the racial composition of the jury and venire at trial;

      (c)     failure to object to jury instructions regarding criminal responsibility and the drug-free school zone enhancement;

      (d)     failure to object to the introduction of evidence regarding a firearm found in Davidson's home;

      (e)     failure to call Jason Coleman as a witness; and

      (f)     failure of appellate counsel to raise the issue of jury composition on appeal;

(2)     Racial discrimination by the trial court in violation of the Sixth, Eighth, and Fourteenth Amendments in assembling the jury venire;

(3)     An unreasonable search of Davidson's home on grounds that the preconditions for the anticipatory warrant had not been met;

(4)     Improper jury instructions that did not require the prosecution to prove criminal responsibility beyond a reasonable doubt or the natural and probable consequences of the drug offense; and

(5)     Withholding of exculpatory material evidence by the prosecution.

(Doc. No. 25.)

The amended petition also incorporates all claims made by Davidson in his pro se filing.

(*Id.*)

## IV.    **Legal Standard**

Davidson's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F. 3d 754, 762 (6th Cir. 2006). Under its "highly deferential standard . . . state-court decisions [must] be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005); *see also Hardy v. Cross*, 565 U.S. 65, 66 (2011); *Felkner v. Jackson*, 562 U.S. 594, 597 (2011).

The AEDPA standard is difficult to meet "because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011); *see Burt*, 134 S. Ct. at 16; *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, 563 U.S. at 102–03; *see Woods v. Donald*, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (*Bell II*). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Parker v. Matthews*, 567 U.S. 37, 38 (2012); *see also White v. Wheeler*, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting *Burt v. Titlow*, 134 S. Ct. 10, 16 (2013)).

The statute provides for the review of state court decisions in § 2254(d), which states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by clear and convincing evidence." *Davis v. Ayala*, 135 S. Ct. 2187, 2199–2200 (2015). A federal habeas court may issue the writ for a state court's legal error under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. *Bell II*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405–06). In determining whether federal law is clearly established, this Court may not rely on the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 4 (2014); *Harriss v. Stovall*, 212 F.3d 940, 943–44 (6th Cir. 2000). AEDPA limits the source of law applied in determining whether a state court decision is contrary to clearly established federal law to the holdings, not dicta, of cases decided by the Supreme Court of the United States. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). Moreover, "clearly established Federal law" under AEDPA does not include Supreme Court decisions announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565 U.S. 34, 39 (2011). The inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state court's adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing *Green*, 565 U.S. at 38).

The Court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from United States Supreme Court decisions but unreasonably applies it to the facts of the particular case." *Bell II*, 535 U.S. at 694. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly

established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell II*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 134 S. Ct. 1697, 1706–07 (2014) (quoting *Harrington*, 562 U.S. at 103).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. *Rhines v. Weber*, 544 U.S. 269, 274 (2005). With certain limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the same claim on the same grounds before the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also Lyons v. Stovall*, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." *Coleman*, 501 U.S. at 732. If the claims can no longer be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of *any* federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

## V.      Analysis

Davidson's amended petition raises both properly exhausted claims and procedurally defaulted claims. The Court considers these claims separately under the relevant AEDPA standards.

### A.      Davidson's Exhausted Ineffective Assistance of Counsel Claims

Davidson's appeal of the trial court's denial of his petition for post-conviction relief raised only the issue of whether his trial and appellate counsel were ineffective. *Davidson II*, 2014 WL 3765710 at *1. Specifically, Davidson argued that trial counsel was ineffective in failing to (1) adequately argue the motion to suppress, (2) effectively challenge the racial composition of the jury and venire, and (3) argue for a jury instruction on the natural and probable consequences rule. *Id.* Davidson argued that trial counsel and appellate counsel were both ineffective for failing to maintain adequate communication with him during their representation. *Id.* The TCCA addressed these claims on their merits under the standard articulated in *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984). *Davidson II*, 2014 WL 3765710 at *15–16.

*Strickland* sets a two-part test to evaluate whether counsel has been constitutionally ineffective. A petitioner must prove (1) that counsel's performance fell below an objective

standard of reasonableness and (2) that, but for counsel's deficient representation, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688–89, 694. The *Strickland* standard sets a high bar that is not easily surmounted by habeas petitioners. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) (quoting *Strickland*, 466 U.S. at 690).

Where a state court correctly identifies *Strickland* as the controlling precedent and applies it in evaluating a petitioner's claims, this Court applies a doubly deferential standard in its review. *Leonard v. Warden, Ohio State Penitentiary*, 846 F.3d 832, 848 (6th Cir. 2017). The Court must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard" and, if so, must deny relief. *Id.* (quoting *Harrington v. Richter*, 562 U.S. 86, 89 (2011)). "The pivotal question," therefore, is not whether this Court would find counsel's performance deficient, but "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101. The Court considers the TCCA's determination of each of Davidson's ineffective assistance claims through this doubly deferential lens.

### 1. Failure to Adequately Argue the Motion to Suppress

Davidson argues that his trial counsel failed to adequately argue his motion to suppress by "(1) failing to argue that the pre-condition for the anticipatory search warrant [(i.e., delivery)] was not met, and (2) failing to include a discrepancy between the tracking number on the package and the tracking number stated in the warrant affidavit." (Doc. No. 25, PageID# 119.) The TCCA considered and rejected these claims as follows:

> As his first issue of ineffective assistance, the petitioner contends that trial counsel failed to raise the issue of the discrepancy in the tracking numbers or challenge the "delivery" requirement of the anticipatory warrant in the motion to suppress. He contends that had trial counsel raised these two issues, the evidence would have

been suppressed, and the case against the petitioner would have "crumbled." In denying relief on this ground, the post-conviction court found that trial counsel had zealously raised all appropriate issues and defenses on the petitioner's behalf.

After review of the record, we find nothing which preponderates against the postconviction [sic] court's findings. Clearly, a motion to suppress was filed by trial counsel, and it was argued at two hearings before the trial court. Trial counsel testified that he strongly believed that he had successfully raised issues to argue. In fact, he testified that, despite the trial court's denial, he was prepared to represent the petitioner for free on appeal because he believed so strongly in the suppression issues.

Trial counsel acknowledged that he did not argue for suppression based upon the discrepancy in the tracking numbers or the delivery requirement. In fact, he acknowledged that he was not even aware of the discrepancy in the tracking numbers from the affidavit to the warrant. He testified, however, that even if he had known, he did not believe that he would have raised the issue in the motion to suppress because he believed the issues he did raise in the motion were far more serious and viable issues. Trial counsel testified that he was aware of no intentional misrepresentation on the State's behalf in the discrepancy and that, without a showing of such, success was not likely. Basically, trial counsel did not believe that it was a viable issue, despite the petitioner's and appellate counsel's opinion to the contrary. However, this court obviously agreed with the trial counsel. Although finding the issue waived on direct appeal, this court did note that because there was other identifying information in the warrant, the typographical error in the tracking number did not render the warrant invalid. *Davidson*, 2012 Tenn.Crim.App. LEXIS 333, *25, 2012 WL 1795147. This conclusion alone precludes the petitioner from showing an entitlement to relief on this issue.

With regard to the issue of whether the package was "delivered" to the petitioner, trial counsel testified that he and the petitioner discussed the issue. Trial counsel testified that he explained to the petitioner that his action of picking up the package and placing it inside the shop was sufficient to establish delivery and acceptance of the package; thus, the prerequisites of the anticipatory warrant were satisfied in his opinion. We must agree. As pointed out by the State, the petitioner failed to cite to any relevant caselaw which would indicate that "delivery" and "acceptance" were not satisfied by the petitioner's action.

We agree with the State that there is little caselaw to be found in Tennessee dealing with anticipatory warrants. It is clear that our supreme court has embraced the use of "anticipatory search warrants." *State v. Coker*, 746 S.W.2d 167, 172 (Tenn. 1987). Such warrants do not violate the fourth amendment if they are executed following delivery of the contraband. *State v. Wine*, 787 S.W.2d 31, 33 (Tenn. Crim. App. 1989). "The affidavit should inform the magistrate that the known or suspected contraband will be delivered in the immediate future and the basis for the affiant's knowledge that the item will be delivered." *Id.* (citing *United States v.*

*Outland*, 476 F.2d 581 (6th Cir. 1973)). For example, the *Coker* Court found the affidavit in support of the anticipatory warrant to be sufficient where the affiant specifically alleged how the item to be seized would arrive on the premises to be searched. *Coker*, 746 S.W.2d at 172. It is also recommended that a magistrate who issues an anticipatory search warrant condition its execution upon the occurrence of a specified event, such as the delivery of the targeted package. *Wine*, 787 S.W.2d at 33. *See generally*, 2 W. LaFave, Search and Seizure § 3.7(c) at 96 (2nd Ed. 1987).

Other than the court's acceptance of anticipatory warrants and whether probable cause supports them, the State is correct that little more appears in our caselaw. However, the State references several cases from other jurisdictions which seem to indicate that the petitioner's actions were sufficient to fulfill the requirements of the warrant. *See United States v. Turner*, 491 F. Supp. 2d 556, 560–61 (E.D. Va. 2007) (stating that the package that was the subject of the anticipatory warrant was accepted when a person at the address picked up the package from the porch and took it inside); *United States v. Vesikuru*, 314 F.3d 1116 (C.A.9 Wash. 2002) (stating that the anticipatory warrant was properly executed when the package was apparently taken into the house). We agree with the premise in these cases. The petitioner's acceptance of the package was established when he picked it up and carried it inside the premises. Having concluded that delivery and acceptance were established, trial counsel cannot be deficient for failing to challenge the issue in the motion to suppress.

*Davidson II*, 2014 WL 3765710 at *16–18.

The question for this Court in evaluating the TCCA's analysis is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington v. Richter*, 562 U.S. 86, 105 (2011). Regarding the discrepancy in tracking numbers, trial counsel testified that he believed this to be nothing more than a typographical error and that pursuing an argument that the error invalidated the search warrant would detract from other "more serious and viable issues." *Davidson II*, 2014 WL 3765710 at *17. As *Strickland* provides, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. The choice of counsel to pursue only his client's better arguments and not include every possible contention does not fall below objective standards of professional reasonableness. *Id.* at 688. Far from it—such strategic decisions are generally applauded by the courts. *See Jones v. Barnes*, 463 U.S. 745, 753 (1983) ("A brief that raises every

colorable issue runs the risk of burying good arguments—those that, in the words of the great advocate John W. Davis, 'go for the jugular'—in a verbal mound made up of small and weak contentions.") (internal citations omitted). Trial counsel's decision not to pursue this argument is further justified by the TCCA's determination on direct appeal that, "because there was other identifying information in the warrant, the typographical error in the tracking number did not render the warrant invalid." *Davidson II*, 2014 WL 3765710 at *17. The TCCA's determination that Davidson's trial counsel was not ineffective on this ground is a reasonable application of *Strickland*.

The same is true of the TCCA's evaluation of trial counsel's decision not to argue that the anticipatory warrant's triggering event had not taken place. The anticipatory warrant to search Davidson's home stated two preconditions to its execution: (1) the successful delivery of the subject package to the subject address by law enforcement and (2) "[a]n occupant of this residence or someone with control over this residence [accepting] delivery of package as it is presented to them by a law enforcement officer acting in an undercover capacity." (Doc. No. 30-1, PageID# 195.) Trial counsel testified that he discussed the issue of whether these preconditions had been met with Davidson and told him that he believed Davidson's act of picking up the package and taking it inside his shop was enough to constitute accepting delivery. The TCCA agreed that delivery and acceptance had been established and, therefore, that trial counsel's judgment not to make this argument was not deficient. *Davidson II*, 2014 WL 3765710 at *18.

The TCCA's determination is reasonable under *Strickland*. Terms used in warrants and their supporting affidavits are to be interpreted in a "commonsense and realistic fashion." *United States v. Ventresca*, 380 U.S. 102, 108 (1965); *United States v. Miggins*, 302 F.3d 384, 395 (6th Cir. 2002) (holding that "warrants and their supporting documents are to be read not

hypertechnical[ly] but in a commonsense fashion"). The Sixth Circuit has found in similar circumstances that "delivery and acceptance" as a triggering event may be broadly construed. *See Miggins*, 302 F.3d at 395 (finding triggering event of delivery and acceptance of package "by someone inside the residence" met when officer delivered package to someone standing outside who had previously gone in and out of the residence); *United States v. Gendron*, 18 F.3d 955, 966 (6th Cir. 1994) ("Any effort to negate all unintended logical possibilities through the written word alone would produce linguistic complication and confusion to the point where a warrant, in practice, would fail to give the clear direction that is its very point."). Trial counsel's decision not to press this argument falls within the standards of professional reasonableness under *Strickland*, as the TCCA found.

### 2.     Failure to Challenge the Racial Composition of the Jury and Venire

Davidson argues that trial counsel "failed to effectively challenge the racial composition of the all-white jury and the all-white venire" because he "raised the issue only in a motion for new trial, failing to request any argument on that issue, and he failed to produce enough evidence to substantiate this claim before the trial court." (Doc. No. 25, PageID# 119.) The TCCA found the heart of Davidson's argument on this point to be that his counsel "failed to actually present argument regarding the motion for new trial, instead relying on the motion and information contained in the record." *Davidson II*, 2014 WL 3765710 at *18. The TCCA considered the trial court's determination of Davidson's claim on that record as follows:

> The petitioner suggests "[t]his failure to vigorously argue this fundamental constitutional right amounts to trial counsel's ineffective assistance." In fact, the petitioner urges us to review this issue pursuant to *United States v. Cronic. See* 466 U.S. 648, 654 n. 11, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (Prejudice is presumed in certain cases in which there is actual or constructive denial of counsel. Constructive denial occurs when "the performance of counsel [is] so inadequate that, in effect, no assistance of counsel is provided." *Id.* The petitioner contends

that "his trial counsel failed to actively advocate for his cause which resulted in constructive denial of counsel." We disagree.

In denying relief on this ground, the post-conviction court stated:

> Petitioner complained that no African Americans appeared for jury duty on the day the panels were called for his trial. He recognizes that [trial counsel] raised the issue at trial and in the Motion for New Trial. In his Motion [trial counsel] also challenged the procedure used by the Circuit Court Clerk in excusing jurors, thereby contributing to the underrepresentation of African Americans. Petitioner failed to demonstrate how the Clerk's procedure violated Tennessee law, as well as how he was prejudiced by her failure to follow the law. The Court finds that Petitioner, an African American, was well represented during voir dire by an attorney skilled in jury selection and appropriate challenges thereto. Moreover, Petitioner agreed that the Court conducted a full hearing on the issue of underrepresentation of African Americans. The Court finds that this ground has no merit.

Again, nothing in the record before us preponderates against this finding. Trial counsel testified that he felt it was a viable issue for the petitioner and that he diligently pursued it. That the trial court did not agree with his conclusion does not lead to a finding of ineffective assistance of counsel. The record supports that trial counsel zealously represented his client on this matter. Acknowledging this, the petitioner's main complaint now seems to center over trial counsel's failure to actually present argument to the court in support of the motion for new trial on this issue. He makes no other allegations as to what more trial counsel could have done to seek relief.

We are aware of no requirement which denotes that counsel must present argument in support of such motion. Trial counsel testified that he sometimes did and sometimes did not depending upon the court he was before. He was clear that all the issues raised in the motion for new trial in the case were well-established on the record and had been heard by the court at trial. He saw no need to actually reiterate the same arguments before the court. We agree that was not required in order to provide effective assistance of counsel. Moreover, the petitioner has failed to present any argument with regard to prejudice, other than his contention that we apply the *Cronic* presumption. Again, that is not appropriate in this case. Thus, the petitioner has failed to establish entitlement to any relief on this ground.

*Davidson II*, 2014 WL 3765710 at *18–19.

The TCCA's reasoning is again sound. The record shows that trial counsel first raised this issue immediately after jury selection on the first afternoon of Davidson's trial by filing an

"Objection to Jury Array/Pool." (Doc. No. 30-1, PageID# 218; Doc. No. 30-5, PageID# 315.) The proceedings on that motion included examination of the Deputy Circuit Court Clerk regarding the procedures for assembling and excusing potential jurors and trial counsel's introduction of evidence including a record of the entire current Maury County venire, a panel list used on that day, and a census report establishing that almost thirteen percent of Maury County's population is African-American, from which counsel argued that the two African-Americans among the thirty-nine prospective jurors who reported that day was a constitutionally disproportionate representation. (Doc. No. 30-5, PageID# 315–331.) Trial counsel reiterated these arguments in his motion for new trial. That he made the strategic decision not to request oral argument of that motion—having already conducted a hearing before the trial court on this issue—did not render his representation ineffective. Like the TCCA, this Court is aware of no authority directing that counsel must argue every motion filed. The TCCA's determination that Davidson received able "assistance" of counsel on this issue is not unreasonable. *United States v. Cronic*, 466 U.S. 648, 654 (1984).

With regard to Davidson's argument before this Court that trial counsel failed to produce "enough evidence" to support this claim, Davidson has not identified any evidence to suggest what trial counsel should have obtained or how such evidence would have affected his case. Davidson cannot show deficient representation in the absence of some showing of what trial counsel should have pursued. *See Hutchinson v. Bell*, 303 F.3d 720, 748 (6th Cir. 2002). More importantly, it appears that Davidson did not raise this aspect of his claim in the state court. It provides no basis for habeas relief here.

### 3.    Failure to Object to Jury Instructions

Davidson argues to this Court that his trial counsel was ineffective for failing to object to the trial court's jury instructions on three grounds: (1) the instructions did not require the prosecution to prove criminal responsibility beyond a reasonable doubt, (2) they did not require the prosecution to prove the natural and probable consequences of the drug offense beyond a reasonable doubt, and (3) they imposed strict liability and did not require proof of a culpable mental state to invoke the drug-free schools enhancement. (Doc. No. 25, PageID# 119.) Before the TCCA, Davidson argued that, "because he was convicted under a theory of criminal responsibility, the jury should have been instructed on all the elements of criminal responsibility, including the natural and probable consequences rule," and that counsel was ineffective in failing to object to the lack of such an instruction. *Davidson*, 2014 WL 3765710, at *19. Davidson has therefore exhausted this claim to the extent it is based on the sufficiency of the criminal responsibility and natural and probable consequences instructions.

The TCCA observed that Davidson "maintain[ed] that the [natural and probable consequences] instruction was not given in his case," but that the post-conviction trial court found that "'[t]his charge is a part of the criminal responsibility charge, which the record reflects was properly given.'" *Id.* (quoting Doc. No. 30-20, PageID# 1343.) The TCCA presumed the correctness of the trial court's finding that the proper instruction was given in light of Davidson's failure to produce a copy of the jury instructions with the record on appeal. *Id.* The TCCA further noted that Davidson "testified at the post-conviction hearing that he recalled hearing something mentioned during the instructions about the natural and probable consequence rule" and that he "just did not believe it was adequately explained." *Id.* at *20; (Doc. No. 30-25, PageID# 1685.) These findings, coupled with Davidson's failure to assert "what further explanation was required"

or "to even address the issue with trial counsel at the post-conviction hearing," lead the TCCA to conclude that Davidson "failed to carry his burden of establishing either deficient performance or prejudice." *Id.*

The presumption of correctness accorded to the state courts' finding that the natural and probable consequences instruction was given as part of the criminal responsibility charge cannot be overcome here. The record in this Court—which contains the jury instructions (Doc. No. 30-1, PageID# 226–54)—shows that the jury was given the following instruction regarding criminal responsibility:

> A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt. . . . Before you find the defendant guilty of being criminally responsible for said offenses committed by the conduct of another, you must find that all the essential elements of said offenses have been proven by the state beyond a reasonable doubt.

(*Id.* at PageID# 246.) The jury charge also includes an instruction that "[t]he state must have proven beyond a reasonable doubt all of the elements of the crime charged[.]" (*Id.* at PageID# 232.)

In light of Davidson's failure to include the jury instructions in the record on appeal, the TCCA was not unreasonable in presuming correct the trial court's finding the requested instruction was correctly given. This Court need go no further in its analysis to find habeas relief unwarranted on this claim. However, the jury instructions included in this Court's record show that the TCCA's assumption was, in fact, correct. The instruction given does not instruct the jury of any presumption that a defendant intends the natural and probable consequences of his acts. *See Francis v. Franklin*, 471 U.S. 307, 316 (1985) (finding improper instruction that stated a defendant "*is presumed* to intend the natural and probable consequences of his acts). It requires the jury to find "beyond a

reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible." (Doc. No. 30-1, PageID# 246.) The instruction is not contrary to clearly established federal law. *Francis*, 471 U.S. at 316. Habeas relief is not warranted on this claim.

### 4.    Adequacy of Communication

Although Davidson's amended petition does not restate the claim that his trial and appellate counsel failed to adequately communicate with him during the representation, the amended petition incorporates by reference all claims made in Davidson's pro se petition. (Doc. No. 25, PageID# 122.) The pro se petition asserts that error. (Doc. No. 1, PageID# 5.) That claim was exhausted in the TCCA as follows:

> The testimony given by the petitioner and that of his counsel differ in content. On appeal, the petitioner asserts that trial counsel went for "great amounts" of time without contacting him. He contends that appellate counsel "never met with [him] after he was appointed to prosecute the appeal." Based upon this, the petitioner contends that "[i]t is evident that trial counsel failed to adequately discuss tactics and/or defense with" him.

> However, at the hearing, trial counsel testified that he maintained good communication with the petitioner and kept him informed. While the two usually communicated by telephone or letter, the petitioner, who was on bond, did often stop by his office. Trial counsel testified that he always tried to meet with the petitioner if possible. Trial counsel noted that the case was pending for a period of almost three years. During that period, he recalled that the longest he had gone without communicating with the petitioner was two to three months. Additionally, appellate counsel testified that he reviewed the record, did research, and wrote an appellate brief raising what he considered to be the strongest issues. He testified that he met with the petitioner and discussed the brief and that the petitioner seemed pleased with his efforts.

> Based upon its finding, the post-conviction court clearly accredited the testimony of the two attorneys. As noted, that is a determination that this court will not reweigh on appeal. *See State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003). Accrediting their testimony, the court then correctly determined that the petitioner had failed to establish deficient performance. Moreover, he made no argument as to how the alleged lack of communication prejudiced his representation. As such, he is entitled to no relief.

*Davidson II*, 2014 WL 3765710 at *20.

The TCCA's finding that trial counsel communicated with Davidson by letter, telephone, and in person over a period of nearly three years, never going more than two or three months without contact is presumed correct, as is appellate counsel's statement that he met with Davidson and discussed the planned appellate brief and that Davidson "seemed pleased" with his efforts. Davidson presents no evidence to contradict these findings. The Court concludes on these undisputed facts that the TCCA's determination of this claim was not an unreasonable application of *Strickland*.

### B. Davidson's Procedurally Defaulted Claims

Davidson raises several claims in his amended petition that he did not raise in his state-court filings. Those claims are not properly exhausted. Because Davidson has already pursued appellate and post-conviction remedies in state court, he no longer has any remedies available to him in that forum. *See* Tenn. Code Ann. 40-30-102(a). "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but procedurally barred." *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001). Davidson may overcome this bar if he can establish "cause to excuse the procedural default and demonstrate that he suffered actual prejudice from the alleged error." *Davila v. Davis*, 137 S. Ct. 2058, 2062 (2017); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) ("In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the procedural default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.") "[T]he existence of cause for a

procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

### 1. Procedurally Defaulted Ineffective Assistance of Counsel Claims

Davidson did not present several of the ineffective assistance of counsel claims he now raises in all available state forums. Davidson did not raise in his post-conviction petition trial counsel's failure to object to the state-of-mind requirement of the drug-free schools jury instruction or trial counsel's failure to object to the admission of evidence regarding the presence of a firearm in Davidson's home. Nor did he appeal the post-conviction trial court's denial of his claims that trial counsel failed to secure the presence of Jason Coleman as a witness[3] or that appellate counsel failed to raise the issue of racially discriminatory jury selection on appeal. These claims are therefore procedurally defaulted, and Davidson must show cause for the procedural default and actual prejudice resulting from the error. *Coleman*, 501 U.S. at 750.

---

[3]    The post-conviction trial court ruled as follows on this claim:

> Petitioner complains that Mr. Colley failed to secure the appearance of Jason Coleman at trial. Mr. Colley testified that the trial was delayed for a year during which he tried unsuccessfully to find Jason Coleman. He testified that he even hired a lawyer in California and was unsuccessful in securing Mr. Coleman since his parole there had expired. Mr. Colley testified that he was never able to talk with Mr. Coleman to determine if he would be favorable to Petitioner at trial. Petitioner testified that Mr. Colley did not try hard enough to produce Mr. Coleman. He testified that Mr. Coleman would probably have pled the "fifth." He stated that he does not know if Mr. Coleman's testimony would have been good or bad for him, but that he thinks it would have helped. Petitioner failed to show the Court that he was prejudiced by the absence of this witness at trial, or that the trial would have turned out differently with Mr. Coleman's testimony. The Court finds that this ground has no merit. (Doc. No. 30-20, PageID# 1341.)

Ineffective assistance of counsel may establish cause, as can a showing that the factual or legal basis for a claim was not reasonably available at the time of the state court proceedings. *Cvijetinovic v. Eberlin*, 617 F.3d 833, 837 (6th Cir. 2010). Here, to establish cause, Davidson must show that the ineffectiveness of his post-conviction counsel caused him not to raise the issue of his trial counsel and appellate counsel's ineffectiveness in his state post-conviction proceeding.

Claims of ineffectiveness of post-conviction counsel are largely precluded because the Sixth Amendment does not guarantee the right to counsel in post-conviction proceedings. *Davila v. Davis*, — U.S. —, 137 S. Ct. 2058, 2065 (2017) (citing *Coleman*, 501 U.S. at 755) (internal citation omitted). However, an "equitable qualification" of this rule may apply where state law explicitly requires that claims of trial counsel's ineffectiveness be raised in collateral proceedings and not on direct appeal, *Martinez v. Ryan*, 566 U.S. 1, 16–17 (2012), or where defendants are unlikely to have a meaningful opportunity to raise such claims on direct appeal due to the design and operation of the state court's procedural framework. *Trevino v. Thaler*, 569 U.S. 413, 429 (2013). "Tennessee's procedural rules make it almost impossible for a defendant in a typical case to adequately present an ineffective-assistance claim on direct appeal," and Tennessee courts hold that ineffectiveness claims are best resolved in post-conviction proceedings. *Sutton v. Carpenter*, 745 F.3d 787, 792–93 (6th Cir. 2014). Thus, the ineffective assistance of post-conviction counsel, if proved, could show cause for the procedural default of Davidson's claims that his trial and appellate counsel were ineffective. S*ee Trevino*, 569 U.S. at 429; *Sutton*, 745 F.3d at 795–96. However, Davidson does not allege that his post-conviction counsel was ineffective, nor does he argue any resulting prejudice.

Because Davidson has not argued cause for or prejudice arising out of his defaulted ineffective assistance of counsel claims, habeas relief is not appropriate.

### 2. Additional Procedurally Defaulted Claims

#### a. Jury Instructions

Davidson claims in this Court that the jury instructions given on criminal responsibility and the drug-free school zone enhancement at his trial relieved the prosecution of its burden to prove every element of his charged offenses beyond a reasonable doubt. (Doc. No. 25, PageID# 121.) Davidson did not raise these challenges on direct appeal. He did challenge the "natural and probable consequences" aspect of the criminal responsibility instruction in his post-conviction proceeding; however, the trial court found that the claim "should have been raised either during trial or on appeal and ha[s] no merit i[n] a post-conviction setting." (Doc. No. 30-20, PageID# 1340.) Davidson did not appeal that finding to the TCCA. He has made no argument of cause to excuse that default.

Even if Davidson had not defaulted these claims, the instructions on criminal responsibility repeatedly admonished the jury that the prosecution must prove all essential elements, including the natural and probable consequences of a criminal act, beyond a reasonable doubt. They could not reasonably have been understood by the jury as lowering or shifting the prosecution's burden of proof. Further, while Davidson argues that the jury should have been required to find a culpable mental state underlying the location of his activities near a school zone, the TCCA "has held that the Drug-Free School Zone Act is an enhancement statute and therefore does not require a specific mens rea to conclude that a defendant violated the statute." *State v. Reeves*, No. W2012-02656-CCA-R3-CD, 2014 WL 1593153, *9 (Tenn. Ct. Crim. App. Apr. 17, 2014) (citing cases). "Thus, the State is not required to prove that a defendant knowingly committed the offense within 1000 feet of a school zone; it is sufficient simply to prove that the offense occurred within a prohibited

area in order to enhance the defendant's punishment." *Id.* Habeas relief is not appropriate on these claims.

### b.　　　Racial Discrimination in Assembling the Petit Jury

Davidson argued in his original trial proceedings and in his motion for a new trial that the racial makeup of the venire and jury in his proceedings was "not a fair cross-section of the racial make-up of the community." (Doc. No. 25, PageID# 120.) Davidson did not raise that claim on direct appeal, and the post-conviction court found it waived for that reason. (Doc. No. 30-20, PageID# 1340.) Davidson did not appeal that finding to the TCCA.

Again, Davidson does not argue cause or prejudice. However, even if the court were to reach the merits of this claim, Davidson would not be entitled to the relief he seeks. Clearly established federal law recognizes the right "to be tried by an impartial jury drawn from sources reflecting a cross section of the community." *Berghuis v. Smith*, 130 S.Ct. 1382, 1387 (2010). As the Sixth Circuit has held, this is a right to challenge "the pool from which the jury is drawn, and not necessarily the venire panel" in a particular case. *Ambrose v. Booker*, 684 F.3d 638, 645 (6th Cir. 2012). "The Sixth Amendment guarantees only the opportunity for a representative jury, not a representative jury itself. The focus, therefore, is on the procedure for selecting juries, and not the outcome of that process." *Id.*

Davidson alleges in his amended petition that "[t]he venire from which the petit jury was selected contained no African-Americans and was therefore not a fair cross-section of the racial make-up of the community[.]" (Doc. No. 25, PageID# 120.) The record shows that there were seven jury panels called to report for jury duty on the day that Davidson's trial began (Doc. No. 30-5, PageID# 326); each panel should have contained the names of twelve jurors (*id.* at PageID# 327); out of eighty-four possible jurors, twenty had already been excused for various reasons,

leaving sixty-four that should have reported for duty (*id.* at PageID# 327–28); only thirty-nine possible jurors actually reported for duty that day, and only two of those persons were African-American (*id.* at PageID# 315, 328); and, of those two African Americans, only one "actually made it into the box before being excused for cause." (*Id.* at PageID# 315.) The record further shows that Davidson's counsel proffered an exhibit demonstrating that "the entire venire [has an] African American population of over 11 percent, . . . 67 African Americans out of a total venire of 508."[4] (*Id.* at PageID# 317, 321.) Thus, while "the venire panel[s] directly before him" on the day that Davidson's trial began reflected a statistical underrepresentation of African Americans, the record shows that the larger "pool from which the jury is drawn" was statistically in line with the county population, at roughly thirteen percent African-American. *Ambrose*, 684 F.3d at 645. The record here does not show "that the representation of [African-Americans] in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community," and that such underrepresentation "is due to systematic exclusion of the group in the jury-selection process," both required elements to establish a prima facie violation of the right to a jury selected from a fair cross-section of the community. *United States v. Suggs*, 531 F. App'x 609, 619 (6th Cir. 2013). Accordingly, even if the Court were to reach the merits of this claim, Davidson could not prevail.

### c. Reasonableness of Search Pursuant to Anticipatory Warrant

Davidson challenges the reasonableness of the search of his residence under the Fourth and Fourteenth Amendments. (Doc. No. 25, PageID# 121.) This challenge was presented to the state courts at trial (Doc. Nos. 30-12, 30-13), on direct appeal (Doc. No. 30-14, PageID# 1176), and in

---

[4]     Counsel referred to "over 11 percent" of the entire venire being African-American. In fact, the 67 African-Americans make up slightly more than 13 percent of the 508 total jurors.

the post-conviction court (Doc. No. 30-20, PageID# 1287–88.) The post-conviction court ruled that the issue was without merit due to the TCCA's affirmance of the trial court's ruling on Davidson's suppression motion. (*Id.* at PageID# 1340.) Davidson did not appeal this post-conviction ruling to the TCCA, and the claim is therefore procedurally defaulted.

The cause and prejudice inquiry need not be undertaken, as Davidson's Fourth Amendment claim is not cognizable on federal habeas review. In *Stone v. Powell*, the Supreme Court held that, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the grounds that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 482 (1976); *see Rashad v. Lafler*, 675 F.3d 564, 570 (6th Cir. 2012) ("Long-standing precedent precludes us from granting habeas relief based on a state court's failure to apply the exclusionary rule of the Fourth Amendment, unless the claimant shows that the State did not provide him 'an opportunity for full and fair litigation of [his] Fourth Amendment Claim.'" (quoting *Stone*, 428 U.S. at 493)). As a result, this court may not review Fourth Amendment habeas claims unless the petitioner lacked the opportunity "to present his claims to the state courts." *Good v. Berghuis*, 729 F.3d 636, 639 (6th Cir. 2013).

After a full hearing on his motion to suppress in the trial court (Doc. Nos. 30-12, 30-13) Davidson appealed the denial of that motion to the TCCA and then sought post-conviction relief on that issue as well. He had a full and fair opportunity to present this claim to the state courts. This Court must deny habeas review of the claim. *See Good*, 729 F.3d at 640.

### d.    Withholding of Exculpatory Evidence

Davidson claims before this Court that, "[u]pon information and belief, the State in this case withheld material, exculpatory evidence" and that he "reasonably believes that discovery in

this case will reveal evidence that State-actors or members of the prosecution team withheld[.]" (Doc. No. 25, PageID# 121.) This claim was never raised before the state courts and is therefore procedurally defaulted. Davidson does not make any showing of cause and prejudice excusing that default. He also does not identify the evidence he believes was unlawfully withheld by the prosecution. Habeas relief is not appropriate on this claim.

### e.    Denial of Witness Testimony

Davidson states in his pro se petition that "[i]t has just c[o]me to petitioner's attention that a number of witnesses desired to be present an[d] testify during petitioner's trial and sentencing hearing." (Doc. No. 1, PageID# 7.) He states that these witnesses were denied permission to speak at his sentencing hearing but had executed affidavits, which Davidson provides to this Court. (*Id.*) The affidavits of Dana Malave, Chris Alderson, and Sheila Duke are associated with Davidson's filing of a motion to hold his petition in abeyance, filed on the same day as his petition. (Doc. No. 4, PageID# 59–61.) The identical affidavits state that each individual attended Davidson's sentencing hearing in hopes of testifying as to his character, but that trial counsel refused to call them to testify. (*Id.*) The affidavits conclude that "[i]t was stated that the court and the officers that were present had a bar-b-cue to attend and they meaning the court officials were not going to have Mr. Davidson in attendance during his sentenc[ing] hearing." (*Id.*)

The record of Davidson's sentencing reflects that certain crimes of conviction carried a mandatory minimum sentence of fifteen years (Doc. No. 30-2, PageID# 282–291), and that, in advance of the sentencing hearing, the prosecutor and trial counsel agreed that Davidson should receive the minimum term of imprisonment and minimum fine for his offenses, thereby obviating the need for a full hearing. (Doc. No. 30-9, PageID# 845.) Davidson apparently did not object to this agreement at any point before raising it in his petition to this Court. He does not argue cause

to overcome that default. Because this agreement apparently resulted in Davidson receiving the mandatory minimum sentence and fine for his convicted offense, it is unlikely that he could show resulting prejudice. The Court therefore finds that no habeas relief is available on this claim.

## VI.     Recommendation

For the foregoing reasons, the Magistrate Judge RECOMMENDS that the habeas corpus petition be DENIED and this matter be DISMISSED WITH PREJUDICE.

Any party has fourteen days after being served with this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing those objections shall have fourteen days after being served with a copy of them in which to file any response. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of further appeal of the matters disposed of therein. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

ENTERED this 30th day of March, 2018.

ALISTAIR E. NEWBERN
United States Magistrate Judge